case under the Criminal Justice Act, and you may proceed. May it please the Court, my name is Jeffrey Wald and I represent the appellant Baling Dat in this appeal. The evidence seized during execution of the search warrant should have been suppressed because the affidavit lacked probable cause. The government argues in its brief that, quote, the presence of marijuana from the trash alone was sufficient to justify probable cause for the issuance of the search warrant, end quote. Your Honors, that is a radical position that this Court should soundly reject. The .027 grams of marijuana that were found during the single trash pull is a tiny amount of marijuana that is not nearly enough for personal consumption, much less indicative of a drug sale operations. But even looking at all of the facts that allegedly support probable cause, it falls short of a fair probability that evidence of ongoing criminal activity would be found in the house. That amount of marijuana was still a crime in Nebraska at that time, right? At that time, it was still a crime, Your Honor. Was it already a misdemeanor punishable by a fine, that small amount, or was it still a felony or a gross felony or something, a gross misdemeanor or something? Your Honor, my understanding is at the time it was a misdemeanor. It would not have been an enhanced felony. Thank you. Sure. To that point, though, the tiny amount of marijuana that was found in the trash, although it would have been a crime, it does not indicate ongoing criminal activity. All it shows is that somebody at some point threw a tiny amount of marijuana into a trash bag that ended up out front of the residence. That doesn't indicate that there was ongoing, even marijuana use, much less drug sales in the house. Furthermore, you have the four unfired bullets. Well, doesn't it indicate possession of the marijuana in the house recently? Your Honor, it shows that there was possession. The trash in front of the house does have some link to the fact that it may have been in the house, but again, this is a tiny amount of marijuana that would indicate, sure, that there is an indication that there was marijuana that may have been in the house, a tiny amount, but it doesn't indicate that there is a continuing or ongoing presence of either a possession amount of marijuana or that there was ongoing drug sales. That's what the affidavit and the warrant was stating. Well, the Concerned Citizens Report. There was a Concerned Citizens Report that indicated that drugs were being sold and stored from the residence and firearms were within the residence, but as I mentioned or argued in the brief, that this Concerned Citizen, as the magistrate, the Federal magistrate judge indicated, this is an anonymous tip, so there's no indication of reliability, there's no indication of the basis of knowledge, so this tip really should be given very little of any persuasive weight in the probable cause determination. The government came forward with no facts to support how this tip came about, how they knew or supposedly knew, and importantly, the tip simply said drugs were being sold. It doesn't indicate that this was marijuana that was being sold, so any cooperation is extremely limited. It mentioned firearms, though, the Concerned Citizen, right? Yes, Your Honor. The Concerned Citizen did mention that there were firearms that were being sold in 4704 Ellison Avenue, and I do want to touch briefly on those four unfired bullets that were in the trash. However, possession of ammunition and possession of firearms is not per se unlawful, and furthermore, I will concede it's strange, and in fact, Detective Olariat trial said that it was odd. He found it odd that there were these firearms in the trash. He hadn't seen that before, and I would submit that the fact that there are not, sorry, not firearms, but ammunition in the trash, again, does not indicate that there are firearms in the house or that there is additional ammunition in the house. If anything, it indicates that there's not a firearm in the house, because why would somebody throw out ammunition? This is an odd thing, and in Detective Olariat's testimony, he found it odd, and he never said, in my training and experience, we see this often when people who possess firearms, they try to get rid of unspent ammunition. What did he say about the significance of drug residue in trash? Is the more natural inference that the only thing that was ever in the house was drug residue, or that the residue is left over from a larger quantity? Did he speak to that in the affidavit? I'd have to go back and look specifically, but I do believe that he says, based off his training and experience, the fact that there's a presence of drug residue could indicate additional drug. However, I would have to go ahead and look exactly what he said. I'd like to move on to the severance argument. Mr. Dott's argument in that respect is simple. The denial of his motion to sever violates Old Chief. Under Old Chief, a judge abuses his discretion by admitting the record of conviction when an admission is available, but that's exactly what happened here. My client, Bolling Dott, stipulated that he was ineligible to possess a firearm by virtue of a felony conviction. He then moved to sever his trial from Johnny Jocks because the government said that it was going to admit evidence of my client, Bolling Dott's incarceration status. That violates Old Chief because the it was able to offer ineligible status, which my client stipulated to, plus the fact of  So in your view, Old Chief prohibits not just the additional information about the underlying conviction, but that either you can't provide information about the sentence, is that kind of what you're getting at, or that the incarceration itself gives the jury an indication of the nature of the prior conviction? That's correct, Judge Kelley. The language that I'm attaching to from Old Chief is that you cannot have any evidence of the name or general character. So here, there's no, and I see my time has expired. May I answer your question? Go ahead. There's no allegation. I'm not arguing that the government ever put into evidence the underlying conviction, which was a robbery, but by putting into evidence that he was incarcerated, and the purpose of that was to prove that he was incarcerated for greater than one year because that's what they needed to prove as to Johnny Jocks. Did the evidence give any indication how long he was in custody? The evidence indicated that he was, I think the days between the messages was about two to 11 days. However, the purpose of it and the argument of the government was that his incarceration status, the dates of those messages were more than a year after my client's convictions and sentence in the underlying robbery conviction in state court. And the jury had that date. So the jury could put together the date of the conviction and then the date of the communications from a prison or other custodial situation. That was the government's argument, is that because Johnny Jock had these messages and knew when he, when my client was convicted, that he knew he was not merely had a, you know, was convicted of a misdemeanor that put him in jail, but that he was convicted of a felony offense. And that's why he could not transfer a firearm to my client. Thank you, Your Honors. All right. Thank you for your argument. Mr. Bartling, we'll hear from you and we also appreciate your acceptance of the appointment in this case under the CJA. Thank you, Chief. Thank you, Chief Judge. He has you down for five minutes. Thank you. May it please the Court, my name is Petter Bartling and I am the attorney for Mr. Datt. Mr. Datt's case presents a simple but fundamental error. The government was permitted at trial to assume a conspiracy that was never charged and that assumption infected the trial, the verdict, and both sentences. I'll make three points. First, the government used gang evidence and Exhibit 128 to imply joint criminal conduct even though no conspiracy was charged, no aiding and abetting theory was pursued, and no independent evidence tied Datt to a shared firearm scheme. Second, without that improper evidence, the record does not support knowing possession beyond a reasonable doubt. And third, the same uncharged conspiracy presumption drove sentencing enhancements in this case, consecutive sentences in this case, and that compounded the error. Other than, you've got Exhibit 128 which has a number of slides to it. Other than the statements that are in that exhibit, what was the evidence of an independent conspiracy? I think you've mentioned the gang testimony from the agent. Was there anything else that was independent of those two contested pieces of information to establish a conspiracy? No. Judge Kelley, that's a great point. If you remove the gang information in Exhibit 128 from this case, what you're left with is nothing. The government essentially used their conspiracy presumption to bootstrap this otherwise inadmissible evidence, and that's the kind of evidence that this Court has warned against. Essentially, what it did with that evidence was invited the finder of fact to use propensity reasoning to reach that conclusion. Did so the district court admitted some of the, I'll just call them the slides within Exhibit 128, conditionally pending a sort of a bell ruling, is that correct? Is that what happened at trial? That's how I understand it. And what did the district court say established the conspiracy that then resulted in the ruling that those hearsay statements were made in furtherance of that conspiracy? I'm unclear as to how to answer that question because, as you know from your review of the record, defense counsel contended that the gang evidence was not res gestae evidence and the Court concluded that it was. From our point of view, the extensive gang-related evidence, including what you're referring to as the slides, Exhibit 128, was a compilation of texts, videos, and images, including many images from other defendants' phones, not DeLong-Dat's phone, that the Court accepted to establish that a conspiracy existed, but this kind of evidence ought not have been admissible because it's only admissible when it's relevant to a disputed issue. And as I said, it appears what the Court did by admitting that evidence is invite the finder of fact to use propensity reasoning, which ought not to have been done because, again, this Court's been very clear that this type of evidence is only admissible when it is unavoidably incident to proving a charge of defense. DeLong-Dat's charge of defense in account for the superseding indictment only alleged one thing, that he knowingly possessed a Ruger 5.7 firearm on January 26, 2022. It did not allege conspiracy. It did not allege joint possession. And it did not allege aiding and abetting. So you mean when you say this type of evidence is admissible only if it's unavoidable? What do you mean by this type? Thank you, Chief Judge Gallatin. I'm referring to gang evidence and this Court's rulings regarding the same. Well, the Street case is probably the main case on or one of the main cases on this. And it says gang evidence is admissible if it connects the defendant to the ring and threw it to other evidence. Isn't that what happened here? I fundamentally disagree, Judge Benton. There is no conspiracy evidence in this case. There is conspiracy argument by the government as to why this information should come in. A lot of the content of Exhibit No. 128 that didn't relate to DeLong Dat was predating the events outlined by the government and charged in the superseding indictment. And if you think about it that way, this is an ongoing relevant conduct. This is separate and disparate acts that do not relate to the elements of the crime charged. And when you look at Street or you look at this Court's other precedents on gang evidence, the Court has been clear it can't invite propensity logic by the finder of fact. It has to be related to an element charged. And as that goes to DeLong Dat, the element was the transfer of the gun. The testimony at trial, the only testimony at trial about the Ruger 5.7 being transferred was defense witness who said he provided that weapon to Johnny Jock and magazines and ammunition and a backpack. And that was uncontroverted. So the transfer of the weapon didn't even involve DeLong Dat. Thank you. Yeah. There certainly wasn't any conspiracy there. That was a singular act on a singular day that was unrebutted by the government at trial. All right. Thank you for your argument. Thank you, sir. Ms. Mathias, we'll hear from you. And we also appreciate your accepting the appointment in the case. Thank you. May it please the Court, my name is Renee Mathias, and I've had the pleasure of representing Johnny Jock. I think it's important as it relates to Mr. Jock and Exhibit 128 is my client was not prohibited on the date of his arrest. And the gun that is in question was purchased on December 20, 2021. And throughout the court's ruling in docket 338 and throughout the testimony, and even in the government's brief, there are two purchases that my client made. There was one in July of 2021, and then there was one in December of 2021. And the court repeatedly references in 338 and the government that they allowed certain photographs and messages to be admitted because they believed that that gun was the gun in question. And one of the exhibits that I will reference is there is a photo of Baleen Dat on my client's phone holding a firearm. And the date of that was November of 2021. So it is uncontroverted that my client, that is not the Gawk that is charged in the information or in the indictment. So we go back to Exhibit 128 and as this court has had the opportunity, how we started and how we ended with was very unique. Counsel was provided Exhibit 128 that eve of trial, and there were multiple discussions throughout the trial on if and when and how Exhibit 128 is going to be received. Exhibit 128 was offered as substantive evidence by the government, and it is, I believe all defense's opinion, that it is pure propensity and to incline. Exhibit 128 is a lot of things, maybe 78 different things. What is your view on, well, and I'm not asking you to go through one through 78, but are there categories of slides in there that some are admissible, maybe separately? I mean, I could see a trial where the government would introduce 78 exhibits and then everyone would have an opportunity to battle out each individual exhibit. That is correct, and it's an excellent point. That is the problem that Exhibit 128 provided is, in my opinion, you've got three separate categories. You have gang references, you have drugs that belong that and my client were not even charged with, and then you have prior firearm possessions. And each one of those, in my opinion, if you were going to attempt to present those to the court and present them to the jury, should have been individually marked. Did the district court give you an opportunity to, I thought there were a few slides that got pulled, and so did you have the opportunity to explain to the district court, look, 17 and 21 and 54, so that additional ones could be pulled? Yes, there was. So we had the initial conference, the first day of trial, and then approximately three days later, there was another conversation where each defense counsel, we did have the opportunity to say in kind of two categories. One, these were never provided to us until the eve of trial, and how each slide we were able to make. So there's sort of the argument that this one exhibit sort of collectively is an improper way to either present it to defense counsel or to the jury, but then there are individual objections to the slides. Correct. But I thought your position on appeal was the entire exhibit should be excluded. In my opinion, yes. That's the issue for us, whether the entire exhibit should have been excluded? Because I don't believe that defense counsel, we were afforded any other way. In my brief, I do go through specific slides that I believe absolutely should have been excluded, but the way it was presented and the way we were afforded the ability to argue, we had to say either we are objecting in its entirety to exhibit 128 or not objecting. And were there five slides that the district took out entirely? Yes. And was it five the right number? There, actually I think there were three. It related to a previous homicide. Okay. And that's the problem that defense had is how to present our objections. We were given the opportunity to object to individual slides, but when it's all lumped together, each and they are coming from three different phones, my opinion was improperly  I am out of time. Was there any request for a continuance on account of the alleged late disclosure? We did not. Defense did not ask for a continuance. We did object. It was a violation of Rule 16. Yeah, I saw that, but there was no request for a continuance, I see. Okay, thank you. Thank you. Mr. Lehrman, we'll hear from you. Okay. Good morning. May it please the Court. I'm Matt Lehrman on behalf of the FLE. Why don't we begin with the most recent topic, which is Exhibit 128. Exhibit 128. Why don't you, instead of moving the microphone off to the side, move it to where it's facing you. Thank you. Exhibit 128 is nothing more than a compilation. It's a 1006 exhibit. Well, it's not a summary, a typical 1006 summary. If we're talking about individual slides that can be objected to independently, I'm curious why the government, what was the purpose for one exhibit rather than 78? Just because the data that we used to compile it was so voluminous, and that's why we call it a 1006 exhibit, Your Honor, because what we're talking about is three separate cell phones, a cell phone from DeLang Dat, Bailing Dat, and Janie Jock. All of those were offered into evidence. So we had the entirety of the data from those phones, and the data was, it's a tremendous amount. We're talking terabytes. And so the best way to do that was to take that voluminous evidence and put it together in a power, in a slideshow. What I'm trying to get a difference between sort of the typical data summary, sort of here, but we've got all the visits to a certain doctor. And you put a summary exhibit for the jury to understand the collective voluminous, as you say, evidence that you have. This seemed to be just sort of selective choices of different pieces from the cell phones. I'm curious about the difference between those and whether it truly is a summary. Yeah, and you are correct about that. It was selective portions of those phones, but it had to have been selective portions of those phones, because otherwise the alternative would have been to take those cellbrite extractions and go through each phone, to go through. And to be fair, Your Honor, we narrowed that evidence down significantly. We had hundreds and hundreds of slides. We could have had numerous photos, numerous text messages. We could have gone far beyond that. This was the most fair way to summarize that volume. And we took pains to make sure that it was summarized and turned over to defendant in such a way that they could find it. One of the arguments with defendants was that, well, there's so much data in these cell phones that it's hard for us to get to it. We don't know how much is out there. That's fair, because we're talking about terabytes of information with respect to these cell phones. And so what we did is we took this information, we put it in a PowerPoint, and we said, this is where the information is. We put hash marks, that is file pathways, on each and every one of those slides to say, it's right here in this cellbrite report so that you can find it yourself. So for us, that was the best way to do it, as opposed to having a technician get up there and say, these are all the different things per cell phone. Because we could have literally spent two to three days doing that. To have just a single witness go through that compilation within 45 minutes to an hour, we thought that that was the best way to present it to the jury, Your Honor. So it wasn't... What about the timing? Was that just poor preparation by the government to not have it ready? Or was it tactical to disclose it to me before? Or what was the rationale there? Sure. It wasn't poor timing insofar as... I didn't say poor timing. I said it wasn't prepared in time. Sure. A couple of... What's your thought on that? A couple of things. We put defendants on notice that we were going to be using phone contents back on August 8th when we filed our Motion to Eliminate motion. That's 297 and 298 at the district court docket. And what that was, the Motion to Eliminate, to go over gang evidence, cell phone data, a lot of the information that we ultimately included in Exhibit 128. So we put them on notice that this information would be presented. We were waiting on the district court to rule on that. Ultimately, we got a ruling on August 15th that that was coming in. That's the district court ruling at 338. So at that point, knowing that that information was coming in, we did everything we could to put it and compile it together. As I said before, there was a great deal of information, and we had a lot of it to go through. But we had a technician ultimately edit it down to manageable bytes and then go through each one of those pathways so that we could provide it to defendants. So rather than relying on us saying, this is the exhibit, they could go through the discovery that they had since 2022. What was the reason for the timing? The timing is... Not finish preparing it until the night before? We didn't know whether it would be allowed in court. The judge ruled the day before? The judge ruled on August 15th. Trial started August 20th. As I said, we had to have the technician go through and get all of those file pathways, which took days to do. That was the reason for it. You didn't start to prepare the document until the judge ruled on a motion? No, we had prepared a document. But in order to finalize it with those file pathways, we had to know which ones were going to be included and what would be allowed. And so we were waiting on that judge's ruling to do it. So it was a lot of work to get it done. But in terms of the notice to defendants, I just want to make this clear because I don't want there to be any misunderstanding. Defendants had all of this information in August 2022 during our initial discovery. It was all turned over to them. Not only did we turn it over to them, we also turned over what was the beginnings of one of these PowerPoints that had text messages. How many slides did it have? 30 or 40. Okay. And it had photographs. And while we're keeping score, as best my clerk can tell, there's 78 slides. Is that what it ended up with? No, I think it goes to the number 78. But I think there were some that moved. That's what I was going to ask you next. There are four that are clearly blank. 38, 39, 40, 156. Now, the reason I'm going into this, it's very confusing because do we have the original as presented, Exhibit 128? Is that available? Because the judge calls it 128 throughout all this period of time. So we presented the original 128. And as Ms. Mathias alluded to, we spent several hours going through each of the slides and arguing it. Exhibits are often with counsel. Is it available, the original 128? Yes, sir. Okay. And what about versions in between the 128 and what was actually presented at trial? The version you have is what was presented at trial. Wait, now that's going to be my final question. The version we have, is it in the trial transcript? The exhibit's not in the trial transcript, right? Is the exhibit in the trial transcript, is my question. The exhibit's in the trial transcript. We go through the exhibit through Ms. Pignotti, each one of those slides. Yeah, but the exhibit's not there. What's there is testimony about the exhibit. Correct. I see what you're saying, yes. Okay. Is the exhibit available if our clerk makes a request for it? Yes, and I believe we did already send it. Okay, thank you. We did already send it on a thumb drive, I believe. Yes. Now, my question about the timing, you still haven't really answered. Was the exhibit not ready until the night before the trial? Is that why it was only... The final exhibit was not ready until the night before trial. That's correct. I'm sorry to ask another question, but I've got to. You only sent us one, right? You sent us the final one, correct? Yes. Is the first one available? Yes. Okay, thank you. So if there are no more questions regarding that, I'd like to move on to the gang evidence, if I could. Now, a lot is made about the gang evidence and what was offered by the government in this case, but it was very narrow in scope. At no point... Go ahead. I'd like to hear what you think is narrow. I thought there was a lot. There were several pages from the agent talking about the gang, who's in it, who their rival gangs are, what type of robberies, home invasions, drug distributions, what they're involved in. I saw the district court said, so long as the government keeps to a narrow focus on this and keeps it limited, it didn't seem limited.  There was only one witness that testified to any gang-related evidence on behalf of the United States. That was Detective O'Leary. Detective O'Leary was also the affiant with respect to the search warrant, so we bifurcated his testimony to ensure that the opinion testimony, his expert testimony, didn't go over into his factual testimony. He testified for a short period of time, and you are correct, he testified about the trips that gang in particular. He testified that the Langdat, Janey Jack, Bailingdat were members of the gang. He testified to what the gang does in general, not specifying that any of those gang members had engaged in any of that conduct, which is all consonant with what this court allows. So what was the purpose of the gang? What were you trying to get across to the jury? What element of the offense? What was the purpose of that evidence in your trial strategy? So the purpose of the evidence was to make sense of what the evidence was on the scene in the overall context of what was occurring, because there are so many oddities with respect to this search that you can't just say that it's a simple felon in possession of a firearm, transfer of a firearm to a felon. So for instance, when you go through the house itself, it's occupied by numerous individuals. It's occupied by the Dat brothers. There were three of them. There were only two of them at the time of the search was Janie Jock, who's unrelated to those individuals. There were other several unrelated persons within the home. You have the trash poll in which you- What did the unrelated folks in the home have to do with the government's theory? Because Janie Jock was in the home. I thought you were talking about persons other than Jock. I wondered what the other folks. No, Janie Jock in particular. There was another co-defendant who was in the home who was unrelated, who was found with a stolen firearm. He was indicted. He ultimately pled before this case went to trial. He was found with a stolen firearm, marijuana. It's relevant because when you look at the evidence of this case, you have the commonality, which is communal access to firearms and ammunition. We didn't want to make this a gang case, but when you look at one of the key pieces of evidence in this case, which is a picture that's taken on January 26, 2022, at 3 a.m. in the morning, which is four hours before the search warrant is executed, you've got Delaine Dat holding up the Glock 19 that belongs to Janie Jock. He's next to an individual, a Tripset gang member, named Luol Gatluwak. Luol Gatluwak is holding on to Delaine Dat's 5.7 Ruger firearm while Delaine Dat is putting up a Tripset gang sign. That's direct evidence of possession of firearms and transfer of firearms between those two individuals. Now, we can't put that photo into evidence without explaining the nature of the relationship there, considering that the Ruger 5.7 firearm is found in Delaine Dat's room, that the gun that Delaine Dat is holding on to belongs to Janie Jock, that there's... So, is that... Is it the photos? I'll ask the same question I asked one of the defense counsels, which is, other than the parts of Exhibit 128 that I think were objected to as hearsay for purposes of admission and the gang evidence, what was the independent evidence of a conspiracy here? So, you have what is numerous photographs between the individuals, as well as text messaging between individuals referenced the sale and purchase and transfer of firearms. Everything from throwing a gun into a bush to giving it to another individual. Well, wasn't some of the... I'm sorry to interrupt, but some of the text messages wasn't that objected to on hearsay grounds and it was admitted under a bell ruling. So, I'm trying to figure out what independent of those statements, because those are the statements you're trying to get in under... So, those were the statements that we were trying to get in, but most of which were text messages between those individuals, between other individuals, including a defense witness that testified, Nayat Pan. He was the individual who purchased the Ruger 5.7 firearm. So, you have a number of text messages. You have a number of photographs and other information on scene related to this ongoing conspiracy to transfer firearms and guns. As I was stating earlier, you have, on the one hand, you have Delane Dat's room where he has a Ruger 5.7 firearm, but on the floor of his bedroom is a blue nitrile glove and within it are 38 rounds of .40 caliber firearm and a .45 caliber, excuse me, ammunition and .45 caliber ammunition. The only .40 caliber firearm that was found is in the next room and that belongs to Beling Dat, which is a Glock 23 firearm that was purchased by Janie Jock. In Janie Jock's room, you have 5.7 by 28 ammunition. He didn't have a 5.7 firearm. The only person who had that was Delane Dat. That firearm matched up to Janie Jock's half-open box of ammunition. So, it's all of that evidence compiled together that showed the ongoing transfer between parties in this sort of communal sharing of firearms between TRIPSET gang members, not to mention Nyat Pan, a defense witness, who testified that the Ruger 5.7 firearm that ultimately landed in the hands of Delane Dat as well as another TRIPSET gang member, Luol Gatluwak, himself a felon, was given over to Janie Jock and somehow made its way to those two individuals. So, that's the evidence attendant to the conspiracy that was ongoing at the time. And so, when you look at Exhibit 128, it goes beyond just photographs. It goes to establishing the ongoing use and possession of firearms by Delane Dat, by Bayling Dat, by Janie Jock. It goes to consciousness of guilt with respect to Janie Jock, specifically looking up things like how do you prove a straw purchase? Straw purchasers, can they find a gun? Other things like that to establish that during the time that he's purchasing firearms, which goes back several months. It goes back to December 20th in which he purchased the firearm that was found in Bayling Dat's room to a Glock 19 firearm that was ultimately found or shown in a photograph with Delane Dat. That was purchased July 31st, 2021. So, it's a several month time span that you have this ongoing conspiracy with these individuals to share and transfer firearms between this. This has to be understood in the context of what was occurring, which was rival gangland murders. You had Goa Dat, the brother of Bayling and Delane Dat who was murdered in October. And the person thought to have murdered him was murdered himself just a month later. Was that evidence presented? That wasn't presented. The latter was not presented. Goa Dat's murder was presented with respect to this. And it was also contained- Without objection? Was that objected to? I believe it was. And it was also contained within the affidavit of Detective Olry. So, within that context, this is what's occurring. So, I say all of these things to sort of provide the context to why Exhibit 128 was important and why this evidence was necessary, the gang evidence was necessary to establish these outlier bits of evidence with respect to nine millimeter shells or live ammunition that's thrown away in a rubber glove in a dumpster when that same sort of setup, rubber gloves and ammunition is found within the house where we have a picture in Exhibit 128 of Bayling Dat holding firearms, three different firearms while wearing rubber gloves. That's all important. And it necessarily helped the jury understand what was occurring during this case because it's more complex than just the idea that police are going in on a search warrant on January 26, 2022 and proving something as simple as a felon in possession case. Are there any other areas you'd like me to discuss? Yes, what was the government, and I've forgotten, what was the government's theory of the drug trafficking crime that Bayling possessed the firearm in relation to? So during the trash pull, I'm sorry, I'm looking for the name of a crime, the name of the crime. Possessed with intent to distribute cocaine. That was the drug trafficking crime. That's what he was charged with. Yes, sir. Okay, thank you. Yeah, that's what he was charged with and convicted of. Are there any other questions? If not, I will submit on that basis. Thank you. All right. Thank you for your argument. Thank you at all, counsel. The case is submitted and the court will file a decision in due course. Counsel are excused.